# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 20-81280-CIV-ALTMAN/Brannon

**MELISSA ARNETTE ELLIOTT**,
*also known as Missy Elliot*,

    *Plaintiff*,

v.

**TERRY WILLIAMS**,

    *Defendant*.
_____/

## ORDER

Melissa Elliot, commonly known as "Missy Elliot," is a famous singer, songwriter, and recording artist. In our case, though, she's the Plaintiff, suing Terry Williams, a music producer she rehearsed with in the mid-1990s. At its core, her lawsuit is about ownership—specifically, ownership over the songs she rehearsed at Williams's home studio in Philadelphia. But we needn't delve into the merits of this dispute because there's already a federal judge in Pennsylvania who's been handling this same case—the same songs, the same Philadelphia studio, the very same personalities—for years. And so, whether under the "first-filed rule" or the transfer statute, 28 U.S.C. § 1404(a), this case must be transferred to the Eastern District of Pennsylvania where it belongs.

### BACKGROUND

From 1993 to 1995, Elliot performed with "Sista," an R&B group. *See* First Amended Complaint ("FAC") [ECF No. 9] ¶ 13. In 1994, Sista released an album called *4 All the Sistas Around Da World*, for which Elliot was credited as a songwriter. *Id.* ¶ 18. In addition to performing and recording with Sista, Elliot also wrote her own lyrics and then rehearsed those lyrics with other artists, producers, and sound engineers. *Id.* ¶¶ 20–22. To help Elliot hear how her lyrics sounded with musical accompaniment, the producers often played her "sample" (or pre-recorded) beats and allowed her to

record herself singing over those arrangements. *Id.* ¶ 22. The purpose of the sessions, though, was *not* to wed her lyrics to the producer's background music; it was, rather, for Elliot to get a sense of the arrangements she preferred and to hear how her lyrics sounded against a musical backdrop. *Id.* ¶¶ 28, 33–35, 37.

Williams was one of the producers Elliot worked with in the mid-1990s. During that time, Elliot "sporadically" visited his home studio in Philadelphia,[1] where she rehearsed her lyrics alongside his sample beats. *Id.* ¶ 24. Elliot alleges that, while Williams may have used *some* of his own beats and backtracks during those sessions, *many* of those beats were samples he hadn't created. *Id.* ¶ 25. Elliot also claims that Williams "never contributed to or provided input on [her] independently created lyrics, vocal arrangements and melodies," that she never entered into any kind of agreement with Williams, and that she never intended to share any authorship rights with him. *Id.* ¶¶ 27, 29, 38, 39, 41. At some point between 1993 and 1996, Elliot wrote the lyrics to a song called "Heartbroken," which was eventually recorded by another artist, Aaliyah. *Id.* ¶¶ 30–31. Elliot ultimately received songwriter credits for eight songs that appeared on Aaliyah's album—including "Heartbroken." *Id.*

Twenty years later, in January of 2017, a woman named Constance Gary contacted Elliot's talent-management company and offered to sell Elliot eight musical tracks on behalf of a "friend." *Id.* ¶¶ 44–45. Elliot's attorneys responded to the solicitation, and Gary later represented to the attorneys that the "friend" was Williams. *Id.* ¶¶ 45–46. In a subsequent letter, Gary told Elliot's attorneys that, just the day before, she'd realized that the chorus in one of the eight tracks was "identical" to the "Heartbroken" chorus. *Id.* ¶¶ 50–52. In her next few letters, Gary threatened to sue Elliot for copyright infringement and suggested that Elliot should settle the matter "discreetly" as a way of avoiding bad

---

[1] Elliot appended to the FAC an order from the parallel litigation in *Williams v. Elliot*, No. 2:18-cv-05418-NIQA (E.D. Pa. Feb. 6, 2020), ECF No. 69. That order indicates that Williams's home studio was in Philadelphia. *See id.* at 1 n.1.

press. *Id.* ¶¶ 53–57. Gary eventually demanded $5 million for the songs in Williams's catalog. *Id.* ¶¶ 60–62. This correspondence between Gary and Elliot's attorneys lasted until about August 31, 2017. *Id.* ¶ 62. Four months later, on January 11, 2018, an attorney named Albert J. Olizi, who "formerly represented" Williams, sent his own letter to Elliot's lawyers—this time with a list of 34 unpublished songs that featured Elliot's vocal performances. *Id.* ¶ 63. In the letter, Olizi made clear that Williams was offering to sell those 34 songs to Elliot. *Id.* On July 12, 2018, Olizi sent Elliot's attorneys those 34 recordings. *Id.* ¶ 67.

On November 14, 2018, Williams sued Elliot (and several others) in Pennsylvania state court, advancing a farrago of state and federal claims—including breach of contract, unjust enrichment, quantum meruit, accounting, constructive trust, and one count under the federal Declaratory Judgment Act. *Id.* ¶¶ 39–69. Elliot promptly removed the case to the Eastern District of Pennsylvania, where Williams filed an amended complaint, adding federal copyright claims. *Id.* ¶ 73. Although the court initially dismissed the claims against Elliot, *id.* ¶ 75, Williams ultimately[2] obtained leave to file the now-operative Fourth Amended Complaint against Elliot and her co-defendants, *see Williams v. Elliot*, No. 2:18-cv-05418-NIQA (E.D. Pa. Nov. 16, 2020), ECF No. 91 (the "E.D. Pa. Complaint").

In the E.D. Pa. Complaint—the facts of which should sound familiar—Williams alleges that, from 1993 to 1996, he owned a home music studio in Philadelphia where he often worked with Elliot. *Id.* ¶¶ 1–2. He adds that he and Elliot "were equal contributors to the writing of lyrics and music, co-producing several songs composed" during that time, and that they recorded several songs on two digital audio tapes. *Id.* ¶ 3. One of those songs, he claims, was "Heartbroken." *Id.* ¶ 4. Williams also avers that the pair had an agreement to share in any profits they earned from the songs they recorded at the studio, and that they, in fact, jointly published and profited from some of those songs. *Id.* ¶¶ 8–

---

[2] To keep our story moving, we've skipped a few amended complaints, several motions to dismiss, and at least two motions for leave to amend.

11. He insists that, without informing him, Elliot contracted with third parties (now the co-defendants in the Pennsylvania action) to create "derivatives" of his and Elliot's joint works. *Id.* ¶ 12–15.

Twenty years later, Williams continues, he contacted Elliot "as a courtesy"—and with an eye towards selling his rights to the recordings the two had created together. *Id.* ¶ 23. In reviewing his material during those correspondences (he says), he discovered, for the first time in 20 years, that one of his songs was identical to Aaliyah's 1996 hit "Heartbroken"—and that three other songs in his catalog bore a close resemblance to three songs Sista had published in *4 All the Sistas Around Da World*. *Id.* ¶¶ 24–25. Elliot's attorneys responded to these initial communications, and her business manager eventually instructed Williams to contact Elektra, which owned the rights to the songs Williams was claiming for himself. *Id.* ¶¶ 23, 30–31.

In Count V of the E.D. Pa. Complaint—the declaratory-judgment count—Williams asks the court to declare that

> [1] Plaintiff is the co-author of the lyrics, vocal arrangements and melodies underlying and embodied within the subject Recordings, in addition to any other recordings the Plaintiff possesses featuring and or cowritten by defendant Elliot[;] [2] Plaintiff did jointly author all of the lyrics, vocal arrangements or melodies in the Recordings and is an equal co-owner in the copyrights in any of the lyrics, vocal arrangements or melodies in the Recordings and does hold an equal undivided interest in the copyrights to the lyrics, vocal arrangements or melodies in the Recordings; [3] Defendant Elliott has not executed a valid transfer of ownership in copyright with the Plaintiff, to claim sole ownership to the lyrics, vocal arrangements and melodies underlying and embodied within the subject Recordings; [4] All Defendants, and their agents, officers, servants, employees, successors and assigns, and all others acting in concert or in privity with all of the Defendants, are preliminarily and permanently enjoined and restrained from directly or indirectly exploiting any of the Recordings or derivatives thereto, including, without limitation, displaying, reproducing, transferring or distributing the Recordings or derivatives in any respect without compensating the plaintiff; and [5] As a result of Plaintiff's joint authorship and co-ownership of the lyrics, vocal arrangements and melodies underlying and embodied within the subject Recordings and other recording in his collection, any and all assignments, transfers and/or licenses by Defendant Elliott or any other Defendants, of any of the Recordings and or derivatives thereto are non- exclusive.

*Id.* ¶¶ 61–69. Elliot's motion to dismiss Williams's Fourth Amended Complaint, *see Williams v. Elliot*, No. 2:18-cv-05418-NIQA (E.D. Pa. Nov. 30, 2020), ECF No. 93, is pending in the Eastern District of Pennsylvania, *see generally* Docket, *Williams v. Elliot*, No. 2:18-cv-05418-NIQA (E.D. Pa.).

## PROCEDURAL HISTORY

On August 6, 2020—after Williams's action had been pending in the Eastern District of Pennsylvania for almost two years—Elliot sued Williams here. *See* Original Complaint [ECF No. 1]. A month or so later, on September 18, 2020, she filed the operative FAC. In that FAC, Elliot asserts only one count—under the Copyright Act and the federal Declaratory Judgment Act—and asks the Court to declare that she's the sole author and owner of what she calls the "Unpublished Recordings" (or any other of her unpublished works Williams might possess). FAC ¶¶ 85–100.

Williams, proceeding *pro se*, responded with a Motion to Dismiss or Transfer Plaintiff's First Amended Complaint (the "Motion") [ECF No. 12], which is now ripe for adjudication.[3] In the Motion, Williams submits three arguments. *First*, he says that the Court lacks personal jurisdiction over him because he lives in Delaware and the songs at issue were recorded in Philadelphia. *Id.* at 2. *Second*, he contends that the FAC should be dismissed *both* because the allegations are implausible *and* because the applicable three-year statute of limitations has expired. *Id.* at 3–7. *Third*, he argues that the case should be transferred to the Eastern District of Pennsylvania under the auspices of 28 U.S.C. § 1404(a). *Id.* at 7–9.

## THE LAW

When a complaint involving overlapping parties and issues has been filed in another federal district, the "first-to-file" rule creates "a strong presumption" that the case should be heard by the

---

[3] *See* Plaintiff Melissa Arnette Elliot's Response in Opposition to Defendant Terry Williams's Motion to Dismiss Plaintiff's First Amended Complaint and Supporting Memorandum of Law ("Response") [ECF No. 21]; Defendant's Reply to Plaintiff's Opposition to Defendant's Motion to Dismiss or Transfer Plaintiff's First Amended Complaint ("Reply") [ECF No. 22].

court in which the matter was first filed. *See Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 (11th Cir. 2005); *accord Vital Pharms., Inc. v. PhD Mktg., Inc.*, 2020 WL 6162794, at *1 (S.D. Fla. July 28, 2020). The "first-to-file" rule (as it's come to be known) requires that the second-filed case be dismissed or transferred to the district where the first-filed case is pending. *See Manuel*, 430 F.3d at 1135; *accord Merrill Lynch, Pierce, Fenner & Smith, Inc., v. Haydu*, 675 F.2d 1169, 1174 (11th Cir. 1982).

The "first-to-file" rule is grounded in principles of comity and sound judicial administration. *See Vital Pharms.*, 2020 WL 6162794, at *1 ("The federal courts have long recognized that the principle of comity requires federal district courts—courts of coordinate jurisdiction and equal rank—to exercise care to avoid interference with each other's affairs." (quoting *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950 (5th Cir. 1997))). The rule aims to prevent the needless expenditure of judicial resources and to avoid conflicting rulings. *Id.* Because the rule bears on the court's jurisdiction, moreover, the court can (and should) raise it *sua sponte*. *See Aadyn Tech., LLC v. Pro. LED Lighting, Ltd.*, 2014 WL 12489975, at *3 (S.D. Fla. Dec. 10, 2014) (collecting cases and explaining that, "[b]ecause the first-filed doctrine involves a court's exercise of jurisdiction, a court may (and indeed, should) raise the issue *sua sponte*"); *see also QVC, Inc. v. Patiomats.com, LLC*, 2012 WL 3155471, at *2–3 (E.D. Pa. Aug. 3, 2012) (addressing the first-to-file rule on a motion to transfer under § 1404(a), even though "the parties' briefs failed to mention the first-filed rule").

Notably, the first-to-file rule *doesn't* require that "the parties and issues involved be identical"; it requires only that "they are sufficiently similar or substantially overlap." *Vital Pharms.*, 2020 WL 6162794, at *1 (citing *Manuel*, 430 F.3d at 1135); *see also Save Power*, 121 F.3d at 950 ("The rule does not . . . require that cases be identical. The crucial inquiry is one of 'substantial overlap.'"). Courts should transfer to the first-filed district unless "considerations of judicial and litigant economy, and the just and effective disposition of disputes, require otherwise." *Supreme Int'l Corp. v. Anheuser-Busch, Inc.*, 972 F. Supp. 604, 606 (S.D. Fla. 1997) (quoting *Serco Servs. Co., L.P. v. Kelley Co.*, 51 F.3d 1037,

6

1039 (Fed. Cir. 1995)). "A transfer of a case under the first-filed rule does not depend on the presence or absence of 28 U.S.C. § 1404(a) considerations." *Savage v. Seterus, Inc.*, 2020 WL 230982, at *3 (S.D. Fla. Jan. 15, 2020).

**ANALYSIS**

Although neither party raised the first-to-file rule, this Court can—and should—invoke the rule *sua sponte*. *See Aadyn Tech.*, 2014 WL 12489975, at *3. And the rule unambiguously justifies a transfer here. Our case, after all, is virtually identical to the first-filed action that's been pending for years in the Eastern District of Pennsylvania. Not only are both of our parties involved in that lawsuit, but both cases implicate substantially overlapping questions of fact and law—primarily regarding the nature of the parties' professional relationship, the ownership of the disputed songs, the potential existence of a contract governing those songs, and the purpose of the studio sessions that took place in Williams's home in the mid-1990s. *Compare* E.D. Pa. Complaint ¶¶ 1–15 *with* FAC ¶¶ 24–41. More granularly, both suits involve a dispute over who owns "Heartbroken" (recorded by Aaliyah) and who has the rights to three songs published by Sista. *Compare* E.D. Pa. Complaint ¶¶ 4, 24–25 *with* FAC ¶¶ 18, 30–31. Finally, both suits followed the (ultimately) fruitless correspondence between Gary and Olizi on the one hand and Elliot's representatives on the other. *Compare* E.D. Pa. Complaint ¶¶ 23–25 *with* FAC ¶¶ 44–67.[4]

---

[4] Elliot notes that there are at least 30 unpublished recordings at issue in this case that appear nowhere in the Pennsylvania litigation. *See* Response at 15. But the first-to-file rule doesn't require perfect or complete overlap between the two cases—only that the cases be "sufficiently similar or substantially overlap." *Vital Pharms.*, 2020 WL 6162794, at *1 (citing *Manuel*, 430 F.3d at 1135). Again, because the central events in both cases—namely, the professional (and potentially contractual) relationship, the mid-1990s studio sessions in Philadelphia, and the 2017–18 correspondences—are exactly the same, the first-to-file rule applies.

There is one exception (commonly referred to as the "compelling circumstances" exception) to the first-filed rule. *See Merrill Lynch*, 675 F.2d at 1174 ("In absence of compelling circumstances, the court initially seized of a controversy should be the one to decide the case."). But the party objecting to transfer carries the burden of establishing "compelling circumstances." *Manuel*, 430 F.3d at 1135.

Although Elliot objects to transfer under § 1404(a), she doesn't raise—and there don't appear to be—any compelling circumstances in this case. So, for example, courts have disregarded the first-to-file rule where one party, tipped off to a potential lawsuit by the other, races to his own forum's courthouse. *See Supreme Int'l*, 972 F. Supp. at 606 ("Among the compelling circumstances that may justify departing from the rule are instances where one party, on notice of a potential lawsuit, files a declaratory judgment action in its home forum."). But that's not what happened here. Elliot, after all, filed this action (1) *more than two years after* Williams's representative sent Elliot the list of recordings "for sale" (in early January 2018), (2) *almost two years after* Williams first filed his claims in Pennsylvania state court (in November 2018), and, perhaps most tellingly, (3) only a few days after the Eastern District of Pennsylvania gave Williams leave to file a second amended complaint (on July 7, 2020). *See Williams v. Elliot*, No. 2:18-cv-05418-NIQA (E.D. Pa. July 27, 2020), ECF No. 75.

Other courts have found compelling circumstances based on "the convenience of the parties and the second-filed forum's connection with the controversy." *Lexington Ins. Co. v. Proformance Plastering of Pensacola, Inc.*, 2013 WL 12155502, at *2 (M.D. Fla. Oct. 9, 2013) (quoting *Collegiate Licensing*

---

More than that, though, Williams has amended his complaint a fourth time in Pennsylvania. In that Fourth Amended Complaint, he specifically seeks a declaratory judgment that he is "the co-author of the lyrics, vocal arrangements and melodies underlying and embodied within the subject Recordings, *in addition to any other recordings the Plaintiff possesses featuring and or cowritten by defendant Elliot*." E.D. Pa. Complaint ¶ 69 (emphasis added). In our case, Elliot likewise wants a declaration that Williams "does not hold an equal undivided interest in the copyright and publishing rights to the lyrics, vocal arrangements or melodies underlying the Unpublished Recordings *or underlying any other unpublished recording Defendant Williams possesses or maintains*." FAC ¶ 100(b) (emphasis added). As of Williams's filing of the Fourth Amended Complaint, then, each case implicates *all* the recordings—a *complete* overlap that weighs heavily in favor of transfer.

8

*Co. v. Am. Cas. Co. of Reading, Pa.*, 713 F.3d 71, 79–80 (11th Cir. 2013)). But Williams's studio was in Philadelphia, where the parties have (for years) been litigating the same issues Elliot now asks us to adjudicate here. There's no reason to believe that it would be inconvenient for the parties to continue litigating this case in the E.D. Pa.—especially when one considers the benefits to the judicial system that necessarily flow from consolidating these interrelated questions into one case. On the flip side, this District has little (if any) connection to the controversy, which arose from events that took place in Philadelphia and a professional relationship that was centered (if anywhere) in Pennsylvania.

Since the first-to-file rule plainly applies—and given that Elliot cannot show "compelling circumstances"—we needn't say more. We add only that, even if Elliot's case had presented compelling circumstances, we would've used our discretion to transfer the case under the first-to-file rule anyway. *See Supreme Int'l Corp.*, 972 F. Supp. at 606 (explaining that compelling circumstances "do not automatically compel abandoning the first-filed rule" and noting that "[t]he matter is one of discretion for the trial court," such that, "even where those [compelling] conditions are present," the rule is "preferred . . . unless considerations of judicial and litigant economy, and the just and effective disposition of disputes, require otherwise"); *Philbert v. Ethicon, Inc.*, 2005 WL 525330, at *1 (S.D. Fla. Jan. 14, 2005) ("Even where compelling circumstances are present, the first-filed action is preferred even if it is declaratory, unless consideration of judicial and litigant economy, and the just effective [sic] disposition of disputes, require otherwise.").

\*\*\*

And that's where courts often end their analysis—even when, as here, a defendant has asked for transfer under § 1404(a). *See, e.g.*, *Steelers Keys, LLC v. High Tech Nat'l, LLC*, 2019 WL 6609214, at *3 (S.D. Fla. Dec. 4, 2019) ("The Plaintiffs assert that the traditional § 1404 factors militate against transfer. The Plaintiffs, however, fail to cite a case in which the first-to-file rule was defeated by a venue analysis under the § 1404 factors. Defendants often move, on an alternative basis, to transfer

9

under § 1404. In such cases, courts decline to address the § 1404 factors when the first-to-file rule is dispositive."); *Lianne Yao v. Ulta Beauty Inc.*, 2018 WL 4208324, at *1 n.1 (S.D. Fla. Aug. 8, 2018) ("Because transfer is warranted under the first-to-file rule, the Court does not address the parties' arguments under 28 U.S.C. section 1404(a)."). In the interest of completeness, though, we'll add a few (brief) observations about § 1404(a). The upshot—as we'll see in a moment—is that, second-filed or not, we would've transferred this case either way.

*First*, the Eastern District of Pennsylvania is unambiguously a place where the case "might have been brought." § 1404(a). Indeed, it's a place where a substantially identical action *has* already been brought—and Elliot, for her part, wisely doesn't argue otherwise. *See* Response at 19–20.

*Second*, even without the first-to-file rule, the E.D. Pa. action would remain relevant to our analysis of the § 1404 factors. *See Great Lakes Transp. Holding LLC v. Yellow Cab Serv. Corp. of Fla., Inc.*, 2012 WL 12930665, at *9 (S.D. Fla. Feb. 6, 2012) ("After conducting its analysis under 28 U.S.C. § 1404(a), the Court finds that transfer of this action to the Eastern District of Michigan is appropriate. First and foremost, the pending litigation in the Eastern District of Michigan is directly related to the action here. . . . While the factors of Plaintiff's choice of forum and the ability to compel the testimony of Florida witnesses disfavor transfer, these considerations are outweighed by the other relevant factors and the necessity of consolidating the two interrelated actions."); *Podhurst Orseck, P.A. v. Servicios Legales De Mesoamerica S. De R.L.*, 699 F. Supp. 2d 1344, 1353 (S.D. Fla. 2010) (transferring a case where the issues in the action were "so intricately intertwined with claims and funds already at issue in [ongoing] Texas litigation" that it would "make no sense, as a matter of judicial economy, for these matters to proceed on a piecemeal basis in two different district courts").

*Third*, where one court lacks personal jurisdiction over the defendant—or where the case presents difficult questions of personal jurisdiction—courts sometimes transfer under § 1404 rather than dismiss. *See Pat. Holder LLC v. Lone Wolf Distribs., Inc.*, 2017 WL 5032989, at *3 (S.D. Fla. Nov. 1,

2017) ("The Court need not have personal jurisdiction over the Defendants to consider a motion for transfer under either § 1404(a) or § 1406(a)."); *Recao v. Bell Helicopter Textron, Inc.*, 2014 WL 12595302, at *5 (S.D. Fla. Sept. 23, 2014) ("A District Court lacking personal jurisdiction may transfer a case to a District Court in which personal jurisdiction exists, under 28 U.S.C. § 1404(a)." (citation omitted)); 15 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3854 (4th ed. Apr. 2021 Update) ("[S]ome courts have concluded that it conserves judicial resources, and furthers the interests of the parties, to transfer a case from a forum in which there is a difficult question of personal jurisdiction or venue to a district in which there are no such uncertainties.").

Since this Court appears to lack jurisdiction over Williams—and given the pending litigation in the Eastern District of Pennsylvania, where jurisdiction is undisputed[5]—the wiser course would be to transfer this case to that district. The Eleventh Circuit employs a two-step inquiry to determine whether a court may exercise personal jurisdiction over an out-of-state defendant. *See Mut. Serv. Ins. Co. v. Frit Indus., Inc.*, 358 F.3d 1312, 1319 (11th Cir. 2004). Jurisdiction in this case fails at the first step—application of Florida's long-arm statute. *Id.*

"When jurisdiction is based on a federal question arising under a statute that is silent regarding service of process, Rule 4(e) of the Federal Rules of Civil Procedure directs us to look to the state long-arm statute to determine the existence of personal jurisdiction." *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 626–27 (11th Cir. 1996). Elliot's FAC advances only a single claim under the Copyright Act, 17 U.S.C. § 101, *et seq.*, and the federal Declaratory Judgment Act, 28 U.S.C. § 2201*, et*

---

[5] Elliot hasn't challenged the Eastern District of Pennsylvania's jurisdiction over her, *see generally* Docket, *Williams v. Elliot*, No. 2:18-cv-05418-NIQA (E.D. Pa.)—and, by requesting a transfer, Williams has consented to jurisdiction there, *see Hindi v. BirdEye, Inc.*, 2019 WL 4091425, at *8 (S.D. Fla. Aug. 29, 2019) ("Defendants have stipulated to personal jurisdiction in California by virtue of their request to transfer."); *McGregor v. VP Recs.*, 2017 WL 2833444, at *6 (S.D. Fla. June 30, 2017) ("All moving Defendants have also stipulated to personal jurisdiction in the state of New York by virtue of their request for the transfer[.]").

*seq.* Since neither statute provides for nationwide service of process,[6] we must look to Florida's long-arm statute. Under that statute, a defendant submits to specific jurisdiction in Florida if he engages in one of nine enumerated activities—only two of which are remotely relevant here: "(1) Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state[; or] (2) Committing a tortious act within this state." FLA. STAT. § 48.193(1)(a). Although Elliot doesn't invoke these subsections specifically (or the long-arm statute generally), she seems to imply that one of these two might apply. *See* Response at 13 (arguing that Williams's "deliberate and repeated targeting of a Florida resident, both for solicitation purposes and to threaten the Florida resident with legal action and disruption of the Florida resident's business," subjects him to jurisdiction in Florida).

What "targeting?" Presumably the letters Gary and Olizi sent Elliot's representatives back in 2017 and 2018. But Gary and Olizi sent those letters to Elliot's representatives and attorneys in California, *see* Reply at 2—hardly the kind of thing that would subject Williams to suit in Florida. In any event, the letters weren't tortious—or, at least, Elliot doesn't allege that they were. *See generally* FAC. As the FAC appears to concede, these missives were really nothing more than demand letters, which aren't relevant to the long-arm inquiry, either as evidence of a tortious act or as proof of Williams's "business" in Florida. *See Virgin Health Corp. v. Virgin Enters. Ltd.*, 393 F. App'x 623, 626 (11th Cir. 2010) ("[The plaintiff] claims that [a cease-and-desist] letter qualifies [the defendant] as 'carrying on a business' in Florida under [FLA. STAT. § 48.193(1)(a)]. We disagree. While sending a letter into Florida could invite specific jurisdiction under § 48.193(1)(b) *if the letter itself is tortious*, the

---

[6] *See Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008) ("[N]either the federal Copyright Act, 17 U.S.C. § 101 *et seq.*, nor the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, provides for nationwide service of process, so Fed. R. Civ. P. 4(k)(1)(A) commands the district court (and us) to apply the law of the state in which the district court sits."); *Swift Spinning, Inc. v. Mercados Internacionales, S.A.*, 2008 WL 11417687, at *6 (S.D. Fla. Mar. 7, 2008) ("[T]he Declaratory Judgment Act does not contain a statutory provision authorizing nationwide service of process.").

act of sending the letter, by itself, does not mean that [the defendant] is doing business in Florida for purposes of § 48.193(1)(a). While a demand letter frequently precedes a lawsuit, the letter here cannot be said to have given rise to [the plaintiff's] claims." (emphasis added)); *see also Cornell v. Soundgarden*, 2020 WL 6120588, at *4 (S.D. Fla. Aug. 11, 2020) ("Plaintiff posits that emails and correspondences from the band to Cornell 'over the course of several years' can establish specific jurisdiction. The Court disagrees. . . . Although in very limited scenarios it is possible for *tortious communications* to meet the 'within Florida' aspect of § 48.193(1)(a), Plaintiff does not specify how generic communications 'over the years' are relevant to the tort of conversion." (emphasis added)).

And there's no *other* evidence that Williams engaged in a business venture in Florida—much less a Florida business venture from which Elliot's claim arose. To qualify as "carrying on a business" in Florida for purposes of § 48.193(1)(a), the defendant's Florida-based activities must "be considered collectively and show a general course of business activity in the state for pecuniary benefit." *Horizon Aggressive Growth v. Rothstein-Kass, P.A.*, 421 F.3d 1162, 1167 (11th Cir. 2005) (cleaned up)). Florida courts have identified several factors that might be relevant to this inquiry, including: "the presence and operation of an office in Florida, the possession and maintenance of a license to do business in Florida, the number of Florida clients served, and the percentage of overall revenue gleaned from Florida clients." *Id.* (citing *Milberg Factors, Inc. v. Greenbaum*, 585 So. 2d 1089, 1091 (Fla. 3d DCA 1991); *Hobbs v. Don Mealy Chevrolet, Inc.*, 642 So. 2d 1149, 1153 (Fla. 5th DCA 1994); *Sculptchair*, 94 F.3d at 628). None of those factors is present here. *See generally* FAC; Response.

One last thing: Elliot's contention that "[i]ntellectual property infringement has been found to be an intentional tort sufficient to subject a defendant to personal jurisdiction," Response at 13, makes little sense given that she hasn't accused Williams of infringing her intellectual property at all. As we've said, her FAC contains only one count—for a declaratory judgment. *See generally* FAC. Either way, for the copyright infringement to have subjected Williams to suit in Florida, he would've needed to

13

"conduct[ ] . . . activities in Florida that were 'essential to the success' of [his] alleged infringement[.]" *DeZinno v. McClain Printing Co.*, 2007 WL 9709709, at *9 (S.D. Fla. Apr. 19, 2007). But, again, other than the demand letters—which weren't sent to Florida and aren't relevant in any case—there's no evidence that Williams did *anything* in Florida.

∗∗∗

After careful review, the Court **GRANTS in part** and **DENIES in part** the Motion [ECF No. 12]. Specifically, those portions of the Motion that seek a transfer to the Eastern District of Pennsylvania are **GRANTED**. In all other respects, the Motion is denied *without prejudice*.

Accordingly, the Clerk of Court shall **TRANSFER** this case to the United States District Court for the Eastern District of Pennsylvania. After that, the Clerk shall **CLOSE** this case, **DENY** all other pending motions **as moot**, and **TERMINATE** all deadlines.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 18th day of March 2021.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record
Terry Williams, *pro se*

14